In re the MARRIAGE OF Carla
M. DANIELS and Bruce L.
Daniels.

Upon the Petition of Carla M. Daniels,
Petitioner–Appellant,

And Concerning Bruce L. Daniels,
Respondent–Appellee.

No. 96–0931.

Court of Appeals of Iowa.

April 30, 1997.

Judith O'Donohoe of Eggert, Erb, O'Donohoe, Frye & Von Ah, P.L.C, Charles City, for petitioner–appellant.

Mark L. Walk of Dunkelberg, McKinley, Folkers & Walk, Osage, for respondent–appellee.

Heard by SACKETT, P.J., and CADY and HUITINK, JJ., but decided en banc.

CADY, Judge.

Petitioner Carla M. Daniels appeals the custody and child support provisions of the decree dissolving her marriage to respondent Bruce L. Daniels. The primary task we confront is to determine the relative weight to be assigned evidence of domestic abuse in designating the primary caretaker of the children. We modify the custodial provisions and remand the case to the district court.

Carla, age thirty, and Bruce, age thirty-one, were married in Germany in October 1990. Both were members of the military and, except for Bruce's duty in the Persian Gulf conflict, were assigned together in Germany and the United States. They have two children: Justin, born August 26, 1991, and Kristen, born May 23, 1993. For the most part, Carla was the primary caretaker of the children during the marriage. In November 1994, the parties executed a separation agreement. They physically separated in December. Carla was designated the primary caretaker of the children under the agreement. On January 26, 1995, Carla filed a dissolution petition in Iowa.

Bruce was controlling and abusive during the marriage. He often left the marital home following disputes with Carla. He would also order Carla to do things, and on one occasion injured Justin's elbow when he

grabbed him by the arm and pulled him down a hallway. It was not unusual for Bruce to discipline the children by yelling and spanking them.

Bruce was physically abusive to Carla on a number of occasions. As the marital problems intensified, Bruce frequently pushed or shoved Carla. He also threw an object at her on one occasion. In February 1995, he beat her about the face with his closed fist. He also smashed her diamond ring with a hammer. On another occasion, he struck another soldier in the head with a tire iron.

Much of the domestic abuse occurred in the presence of the children. The February incident occurred in the presence of other military personnel.

Sometime in January 1995, Bruce discovered Carla was having an affair. He reported it to military personnel. As a result, Carla was demoted in early February 1995. Bruce and Carla were in Germany at the time. They were also in separate military commands.

Bruce was ordered by his military superiors to have no contact with Carla or the children following the domestic abuse incident in February. A month later, the orders were revised to allow Bruce to resume contact with the children as long as military personnel assisted by picking up and returning the children. Bruce made some attempts to exercise visitation, but problems developed in arranging military personnel to assist in transferring the children. Bruce subsequently decided to leave the military, as an option to the action against him for the February domestic abuse incident. He received a general discharge under honorable conditions on June 2, 1995, and returned to his family in Detroit, Michigan.

In October 1995, Carla and the children returned to the United States for approximately one month. During this time, the parties unsuccessfully attempted to reach a dissolution settlement. Carla refused to allow Bruce to speak to or visit the children without an order or stipulation defining the parties' custodial rights. On December 19, 1995, the district court entered an ex parte order granting Bruce a six-month visitation commencing within thirty days. The court also directed the case be assigned for trial. On January 11, 1996, Carla brought the children back from Germany pursuant to the court order.

At the time of trial in April 1996, Bruce was attending a computer repair program. He anticipated completion in May 1996. He was receiving weekly unemployment compensation of $293. His intentions were to eventually purchase a home in his parents' neighborhood.

Carla was stationed in Germany as a sergeant in personnel records and was hoping for a promotional assignment. She had recently completed four months in the field. She resided on the base in a three-bedroom apartment, and employed a nanny while she had custody of the children. Additionally, day care and pre-school facilities were available, but Justin had been removed from the day care center because of behavioral problems. Carla testified her overseas assignment was set to end in February 1997 and at that time she hoped to secure a stateside assignment.

The court awarded the parties joint legal custody designating Bruce as the primary physical caretaker. Concerning the evidence of Carla's misconduct and Bruce's abusive behavior, the court observed:

> It would serve no useful purpose to recite the parties' respective errors of conduct reflected in this record. Each has mutually supplied the other with provocation and each must bear responsibility for lack of judgment and immature conduct. The court views their past conduct more with sadness than with censure.

The court expressed concern about the instability the children would face living with their mother while she pursued a career in the military. Her "vulnerability to redeployment" created an "element of uncertainty" for the family. The court was also influenced by the testimony of Justin's pre-school teacher in Michigan who described Justin's poor test scores and the developmental delays he exhibited upon arriving back in the United States. The court was concerned with Carla's use of visitation as "a lever in negotiations." As reasons supporting the physical

care award, the court cited Bruce's ability to provide a "suitable residential dwelling in a decent neighborhood" with his parents, his access to his stepfather and mother as baby-sitters, and Justin's remarkable progress in the Michigan school.

The court determined Carla's net monthly income to be $1735 and set Bruce's prospective monthly earning capacity at $1440. Carla was ordered to pay child support in the amount of $520 per month and also to maintain dependent health coverage for the children. Visitation was awarded to Carla every summer commencing one week after the close of the school year and ending one week before school resumes in the fall. The parties were also awarded Christmas and spring holiday visitation in alternating years. Transportation costs were to be equally divided.

Carla appeals the custody award citing several factors the court neglected to give appropriate weight. These include her primary care experience, her ability to provide for the children financially, her positive attributes as a loving mother and a goal-oriented person, and her ability to support the children's relationship with their father. She contrasts these qualities with Bruce's history of domestic abuse, his pattern of leaving the home during difficult times, and his tendency to inappropriately discipline the children.

Bruce argues he is entitled to primary physical custody because he is better able to administer to the needs of Justin and Kristen. He cites the testimony of Justin's preschool teacher in Michigan who described Justin's poor test results upon arriving in Michigan to live with his father. Bruce contends these test results indicate the lack of care and nurturing the children received while in Carla's custody. He also stresses the advantages of his prospective work commitments versus the more demanding and unpredictable aspects of Carla's life as a single parent in the military. Furthermore, he disputes Carla's characterization of him as an "absentee father" and states his service in the field was never for more than two and one-half to three and one-half weeks at a time. Finally, Bruce cites to the evidence of Carla's extramarital affair with another serviceman in 1994 which resulted in disciplinary action against her in February 1995. He contends her actions had a detrimental effect on the children.

■ Our review in this case is de novo. Iowa R.App. P. 4. Prior cases have little precedential value, and we must base our decision primarily on the particular circumstances of the parties presently before us. *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983). We give weight to the trial court's findings of fact, but we are not bound by them. Iowa R.App. P. 14(f)(7).

■ The critical issue is not which parent possesses the greater right to the children; rather, the controlling consideration must be the best interest of the children. *Heyer v. Peterson*, 307 N.W.2d 1, 7 (Iowa 1981). This decision requires selection of a custodial parent who can minister more effectively to the long-range best interest of the children. The objective should always be to place the children in the environment most likely to bring them to healthy physical, mental, and social maturity. *See In re Marriage of Winter*, 223 N.W.2d 165, 167 (Iowa 1974).

■ We identify numerous factors to help determine which parent should serve as the primary caretaker of the children in a divorce. *Id.; see* Iowa Code § 598.41. These include the characteristics of the parents, as well as the capacity and desire of each parent to provide for the needs of the children. *Id.* Each factor, however, does not necessarily impact the decision with equal force. *See In re Marriage of Grandinetti*, 342 N.W.2d 876, 879 (Iowa App.1983) (extramarital affair given greater weight when misconduct occurred in presence of the children). To the contrary, some factors are given greater weight than others, and the weight ultimately assigned to each factor depends on the particular facts of each case. *See In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992) (each custody decision is based on its own particular facts).

■ We have previously recognized domestic abuse as a factor in determining the custodial parent. *In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa App.1995). This

stems from the ravaging and long-term consequences of domestic abuse on children. *See In re Marriage of Brainard*, 523 N.W.2d 611, 614–15 (Iowa App.1994). A child who grows up in a home plagued with battering can, in many significant ways, be scarred for life. Thus, spousal abuse discloses a serious character flaw in the batterer, and an equally serious flaw in parenting. It also constitutes a crime. *See* Iowa Code § 708.2A. Consequently, we believe evidence of untreated domestic battering should be given considerable weight in determining the primary caretaker, and under some circumstances even foreclose an award of primary care to a spouse who batters.[1] Domestic abuse is, in every respect, dramatically opposed to a child's best interests.

There are several uncontested allegations of violence reflected in the record.[2] In July 1994, Bruce assaulted Carla in front of the children while at a barbecue; Bruce pushed Carla down in October 1994 while he was holding Kristen; Bruce became violent with Carla in the presence of the children on two different occasions in December 1994; and finally, Bruce gave Carla a black eye and abrasions on her face in the presence of the children and then smashed her wedding ring in February 1995. The last and most serious incident took place in the presence of two soldiers assigned to escort Bruce to the home pursuant to a no-contact order imposed by the military following the recent episodes of violence.

■ Many of the troubling consequences of domestic abuse described in *Brainard* are present in this case. Laila Kitchen, the children's nanny in Germany, testified Justin described his father hitting his mother and that the child was upset about the frequent conflicts between his parents. Furthermore, the record indicates Justin exhibited aggressive behaviors in the past and was removed from day care in Germany as a result of these problems. Bruce's propensity to resort to violence in resolving conflicts provides us with reason to be concerned for the safety of Justin and Kristen.[3] Accordingly, we now

---

**1.** We recognize our legislature recently created a presumption against an award of joint custody upon a finding of domestic abuse. *See* Iowa Code § 598.41 (1997). *See also In re Marriage of Brainard*, 523 N.W.2d 611, 614–15. This issue was not presented on appeal. Joint custody, however, is distinguished from primary physical care. Iowa Code § 598.41(5). Physical care refers to the right and responsibilities to maintain a principal home for the minor child and provide for proper care of the child. *In re Marriage of Will*, 489 N.W.2d 394 (Iowa 1992).

**2.** The actual number of incidents are uncertain, as is Bruce's response to each incident, as a result of the trial court's view of domestic abuse evidence. The trial court admonished Carla's trial counsel to refrain from introducing evidence of abusive conduct by Bruce. The trial court directed:

> "I'm going to interrupt the witness again and I'm going to reiterate what I have said. I don't know how I can make it anymore plain. I don't want anymore of this kind [domestic abuse] of testimony coming into the record."

The court then informed counsel he wanted to see them in chambers, where an off-the-record discussion occurred. Subsequently, Carla introduced no further testimony concerning domestic abuse, other than three photographs depicting the results of Bruce's battering. Additionally, Bruce offered no responsive explanation to the various abuse incidents raised by Carla in her testimony.

It would normally be clear error for a trial judge to limit or preclude the introduction of domestic abuse evidence in a dissolution of marriage action involving the issue of child custody or visitation. Both parties to a divorce proceeding should have an opportunity to fairly and fully develop all relevant issues and respond to them. Domestic abuse is clearly relevant to the issue of custody. At the same time, we recognize an offer of proof is necessary to preserve error in the exclusion of evidence.

We are sympathetic to the pragmatic claim asserted by Bruce during oral argument that he did not present responsive testimony or make an offer of proof concerning the domestic abuse evidence because he did not want to risk placing himself in an unfavorable light with the decision-maker. Nevertheless, an allegiance to our system of justice as an institution requires us to adhere to our legal requirement of error preservation. If a risk of unwarranted consequences surfaces at trial, a party must accept the risk and rely on the de novo appellate process to correct any resulting error or inequity. At the same time, we emphasize trial courts should strive to ensure all litigants leave their courtrooms with a sense of satisfaction they were given a full and fair opportunity to present their case.

**3.** *See In re Marriage of Brainard*, 523 N.W.2d 611, 615, n. 3 (Iowa App.1994), where we recognized the "safety of the child" as a statutory factor to consider in awarding joint custody under Iowa Code section 598.41(3)(i) (1993). This

conclude the district court erroneously awarded primary physical custody of the children to Bruce. However, before modifying the decree, we will address the other issues cited by the trial court.

The record indicates Carla did little to assist Bruce in his efforts to arrange visitation following the March 1995 military order granting him supervised visits. We recognize, however, some of the problems in arranging visitation can be attributable to the military orders and, later, to the physical distance which separated Bruce and Carla.

■ A parent's denial of visitation without just cause is a significant factor in determining the proper custody arrangement. *See* Iowa Code § 598.41(1); *see also In re Marriage of Quirk–Edwards*, 509 N.W.2d 476, 480 (Iowa 1993); *In re Marriage of Will*, 489 N.W.2d 394, 399 (Iowa 1992). Carla's prolonged reluctance to permit Bruce to visit the children reflects adversely on her custodial judgment. However, the evidence of domestic violence in this case operates to diminish the significance of this factor in awarding custody. While we determine Carla's eleven-month denial of visitation to be unjustified, it does not justify an award of custody to Bruce. We find the detrimental effects of family violence to be the more compelling factor when considering which custodial award would be in the best interest of the children.

We are also not convinced Carla's military career poses exceptional obstacles to raising Justin and Kristen in a stable environment. We note that from Justin's birth until the parties separated, the couple successfully parented the children while both were pursuing careers in the military. We will not accord Bruce an advantage in our custodial determination simply because he chose to return to civilian life and therefore no longer faces the possibility of deployment. Likewise, the custodial award should not operate as a penalty against Carla's decision to remain in the military and pursue her career. Moreover, our concept of stability transcends

physical location, and focuses on the dynamics of the family home.

Finally, we do not find the evidence of Justin's poor test scores in January 1996 to be conclusive evidence of Carla's parenting skills. The test was given to Justin, at age four, the day after a transatlantic flight and the separation from his mother. We are not persuaded these test results reflect anything more than the stress the child certainly must have been experiencing at the time.

For these reasons, we conclude the court's award of primary physical custody of Justin and Kristen to Bruce was not in the children's best interests. We affirm the order of the district court and modify it to reflect an award of primary physical custody in favor of Carla.

Our decision necessitates the modification of the child support provisions of the decree in addition to the parties' visitation rights. The record indicates the parties' financial and residential circumstances may have changed. Accordingly, we remand these issues to the district court. We do not retain jurisdiction.

■ Bruce has requested attorney fees on appeal based on his student status as compared to Carla's steady income. An award of attorney fees on appeal is not a matter of right, but rests within the court's discretion and the parties' financial position. *In re Marriage of Gilliam*, 525 N.W.2d 436, 439 (Iowa App.1994). We order each party to pay their own attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED.**

All judges concur except SACKETT, P.J., and HUITINK, J., who dissent.

SACKETT, Presiding Judge (dissenting).

I would affirm the trial court.

This is a difficult case, as are most custody cases. Two parents who love their children have been unable to preserve the marriage

statute permits Iowa courts to consider domestic violence as a factor in deciding custody when evidence of harm to the child is presented at trial. *Id.* The opinion also set forth statistical evidence concerning the incidence of child abuse

in homes where spousal abuse is present. Other compelling research is cited that examines the correlation of domestic abuse and the likelihood of children becoming batterers themselves or committing other crimes. *See id.* at 615, fn. 2.

that produced the children. Each wants the children's primary physical care.

The mature, learned trial judge said of the prior behavior of both parents:

It would serve no useful purpose to recite the parties' respective errors of conduct reflected in this record. Each has mutually supplied the other with provocation and each must bear responsibility for lack of judgment and immature conduct. The court views their past conduct more with sadness than with censure.

The trial court also made certain credibility, maturity, and stability assessments based on observing the parents in the courtroom and awarded Bruce custody of the children.

Both parents point to the other's past behavior and evidence of unfitness for custodial care responsibilities. Yet, in assessing a custody case, the bottom line is which parent has the ability to provide as a divorced parent the more nurturing and stable environment where the children's needs will be put in a primary position and the other parent's place in their lives will be recognized, respected, and encouraged. Making this assessment demands a judge look at both the affirmative and negative attributes of each parent and their plans for future care of the children.

Past conduct provides a window to predict future behavior. Past behavior and attributes are assessed to determine the better placement for the children and not to reward or punish either parent. Factors such as lack of consideration for the other parent, including the use of physical force against the other parent, mental abuse and manipulation, name calling, sexual involvement outside the marriage contract, evidence of a parent's putting his or her selfish desires ahead of the general well-being of the family, failing to show respect for the position in the children's lives of the other parent, and alcohol abuse and use of illegal drugs, are but part of a number of factors that can be predictors of future behavior.

Each case must be judged on its own facts. All of the above behaviors, together with others, reflect poorly on a parent's ability to be the better parent in the future.

Bruce exhibited immature and dangerous behavior in reacting to his wife's extramarital affairs by resorting to punches and shoves. This behavior weighs heavily against his receiving custody. In engaging in such behavior, he sets an inappropriate role model for his children.

Carla elected to engage in a sexual relationship outside the marriage, putting her personal needs and desires ahead of those of the family unit and exposing the family unit to the emotional and physical dangers such a relationship entails. In engaging in such behavior, she sets an inappropriate role model for her children. She additionally sought to alienate the children from their father. These behaviors weigh heavily against her receiving custody.

Yet, no one negative behavior should be elevated to the point where it becomes the sole dispositive factor or it cleanses the other spouse of prior sins.

The trial judge looked at the negative behaviors and considered them adversely on each parent's ability to parent their children. He had the parties and witnesses before him. He found Bruce offered the children more future stability. The facts support this conclusion. Giving deference to the trial court's finding, I would affirm.

HUITINK, Judge (dissenting).

I respectfully dissent. In this case the parties have agreed to joint custody. Our task, like the district court's, is to determine the physical care arrangement most likely to accomplish the custodial objectives provided in Iowa Code section 598.41. These objectives include an arrangement which assures maximum continuing contact with both parents and shared parental rights and responsibilities in raising the children. *Id.* The result reached by the majority fails to accomplish these objectives.

The record includes ample evidence supporting Carla's allegations of domestic abuse. The severity and frequency of domestic violence in this case has not been disputed or minimized. Bruce accepted responsibility for his abusive behavior and the resulting negative consequences for the children. The dis-

trict court expressly noted the sincerity of Bruce's contrition and assigned considerable weight to his testimony. Although not bound by the district court's findings of fact, we are deferential to the district court's assignment of credibility. Iowa R.App. P. 14(f)(7). In an unprecedented departure from this basic rule of appellate review, the majority, without explanation, ignores the district court's finding concerning the sincerity of Bruce's testimonial contrition. We are greatly aided in our appellate determination by deference to the credibility assessment by a wise and discerning trial judge. The majority is mistaken in its failure to do so.

Vindication of an abused spouse and advancement of the children's best interests are seldom mutually exclusive remedial objectives. However, a history of domestic violence does not presumptively require an award of physical care to the victimized parent. Domestic violence is one of many considerations the court is required to consider in making its custodial determination. *In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa App.1995); *In re Marriage of Brainard*, 523 N.W.2d 611, 614–15 (Iowa App. 1994).

The majority is extravagantly presumptuous in its declaration that evidence of domestic violence is more compelling than any other consideration mandated by these authorities. This is not a domestic abuse case in which urgent circumstances require the court to resort to such presumptions. Moreover, the statutory scheme of presumptions favoring an award of *sole custody* to an abused spouse is not applicable because the parties have agreed to an award of *joint custody*. Iowa Code § 598.41(4).

The majority's misplaced reliance on contextually inapplicable presumptions favoring Carla and its unexplained disregard of the district court's credibility findings casts considerable doubt on the equity of its custodial award. I strongly disagree with the majority's willingness to rely on presumption and attribution in a physical care dispute. Children are better served in these matters by the court's consideration of *all* of the facts and circumstances present in each case. To hold otherwise permits sensibility and indig-

nation to displace critical judgment. It is simply wrong for the majority to presumptively deny Bruce consideration for physical care.

The record also indicates Carla denied Bruce all contact with the children for ten months following a February 1995 altercation despite Bruce's efforts to obtain visitation with the children. Contrary to Carla's contentions, the evidence supports Bruce's claim that she sought to extract custodial concessions from Bruce by denying him visitation unless he signed a stipulation awarding her physical care. Carla remained unyielding in her refusals until the district court ordered her to return the children for visitation with Bruce and she learned contempt proceedings were imminent.

Although Bruce's behavior may have justified Carla's initial interruption of visitation, I fail to see how the interests of these children were served by denying them any contact with their father for ten months. Moreover, I, like the district court, find Carla's explanation of her steadfast refusal to allow any visitation less than compelling. Carla's attempt to use these children for leverage in settlement negotiations with Bruce reflects adversely on her custodial judgment and substantially compromises the joint custodial objectives referred to earlier.

An award of joint custody is more than a consolation prize for the parent denied physical care. As joint custodians each parent's rights and responsibilities included equal participation in decisions affecting the children's legal status, medical care, education, extracurricular activities, and religious instruction. Iowa Code § 598.41(5). Although the majority is liberal in its attribution of Bruce's negative parental qualities, it is ironically content to endorse a custody arrangement which empowers him to the foregoing extent. It is also difficult to reconcile a successful exercise of the rights and responsibilities inherent in a joint custody arrangement with Carla's demonstrated disdain for Bruce's equal parental participation.

Despite the majority's dire assessment of the children's future in Bruce's physical care, the record indicates that they are comfort-

ably and happily situated in their present circumstances. Justin has made remarkable progress in school. Both children have benefited from their association with Bruce's extended family. The record also reveals no evidence indicating the children display any signs of lingering emotional or behavior problems as a result of past parental conflict.

When this evidence is viewed solely from the perspective of the children's best interests, the wisdom of the district court's custodial award is apparent. The district court noted the children's needs for long-term stability and concluded their present circumstances offer a better opportunity for its achievement. I, like the district court, find it more important to preserve this opportunity for the children's long-term security and stability than it is to vindicate past spousal misconduct. I would affirm the district court.

SACKETT, J., joins this dissent.