# IN THE COURT OF APPEALS OF IOWA

No. 16-1806
Filed December 6, 2017

IN RE THE MARRIAGE OF BRIAN JAMES SEDARS
AND KATHRYN LYNNE SEDARS

Upon the Petition of
BRIAN JAMES SEDARS,
        Petitioner-Appellant,

And Concerning
KATHRYN LYNNE SEDARS,
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Dallas County, Richard B. Clogg,

Judge.



        A husband appeals the physical care and visitation provisions of the

parties' dissolution decree. **AFFIRMED.**


        Ryan D. Babich of Babich Goldman, P.C., Des Moines, for appellant.

        Katie M. Naset of Hope Law Firm, P.L.C., West Des Moines, for appellee.



        Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**MULLINS, Judge**

Brian Sedars appeals the physical care and visitation provisions of the decree dissolving his marriage to Kathryn (Katie) Sedars.  He primarily argues the district court erred in failing to award him physical care of the parties' minor children.  He requests a reversal of that portion of the decree and a corresponding amendment to the parties' child-support obligations.  In the alternative, he argues he should be awarded significantly more visitation with the children.  Both parties request an award of appellate attorney fees.

I.     **Background Facts and Proceedings**

Upon our de novo review and based on the evidence we find credible,[1] we make the following findings of fact.  Brian and Katie married in 2006 and are the parents of two minor children, a daughter and a son, born in 2009 and 2014, respectively.  At the time of trial, Brian was thirty-five years old and Katie thirty-two; both are in good health.  Brian is a program-integrity manager for an insurance company.  In this position, Brian earns approximately $85,000 per year and has the ability to work from home ninety percent of the time.  Katie is a special-education teacher at a middle school earning approximately $40,000 per

---

[1] In this case, we are without the benefit of the district court's credibility determinations. Based on our de novo review of the record we find the testimony of Katie, Brian's mother, and Brian's aunt credible.  We find Katie's testimony credible because, in her testimony, she was willing to concede to the existence of facts that were detrimental to her position in the case.  We find the testimony of Brian's family members credible because both family members were involved in the children's lives, had close relationships with Brian prior to the parties' separation, and their testimony was largely detrimental to his case.

We find not credible much of the testimony of Brian and his significant other, Amanda Smith.  In their testimony, when faced with facts adverse to Brian's case, they either denied such facts outright or attempted to bend them in Brian's favor, even when such facts were supported by other evidence and the testimony of the witnesses we find credible.

year. Katie's position allows her to have time off from work for seasonal and holiday breaks. Both parties conceded at trial that the other is generally a good parent to the minor children. The evidence presented at trial generally focused on the historical caregiving attributes of each party and the conduct of each toward one another during the proceedings. Generally lacking in the evidence is that which would show how either of the parties' behavior during the proceedings had a negative effect on the children.

Brian filed a petition for dissolution of marriage in September 2015 requesting temporary and permanent joint legal custody and joint physical care. Prior to trial, the court approved the parties' stipulation to, among other things, temporary, joint legal custody of the children;[2] a temporary parenting schedule allowing Brian six nights of parenting time and Katie eight nights of parenting time per two-week period and alternating parenting time to each on holidays, school breaks, and other occasions; and Brian's monthly payment of temporary child support in the amount of $782.52. Although the parties initially agreed in their pleadings that joint physical care would be appropriate upon dissolution, both subsequently amended their pleadings to request an award of physical care.

The evidence we find credible supports a finding that Katie was the primary caregiver of the parties' children both before and after the parties separated and that she is more able to minister the children's needs. Although Brian assisted with caring for the children when available and when the

---

[2] The agreement required, among other things, equal participation in "decisions affecting the children's legal status, medical care, education, extracurricular activities, and religious training" and that each party "foster feelings of affection and respect between the children and the other party."

assistance was needed, we find Katie shouldered the bulk of tasks associated with caring for and raising the children. When the parties' first child was born, parental duties were generally divided based upon the parties' work schedules, availability, and other family tasks, with the exception of breastfeeding, which fell to Katie. The division was largely the same when the parties' second child was born, but at this point Brian provided more of his time to the older child than the younger because Katie was breastfeeding, and as the younger child's source of sustenance, was naturally required to provide more attention to the younger child. Katie was more able to attend to the children's specific needs when they were infants, as Brian has "never been a huge fan of babies." Katie has primarily cared for the children during periods of her maternity leave, seasonal and holiday breaks from school, and Brian's battle with thyroid cancer.

Shortly before filing his petition, Brian decided he wanted to pursue a relationship with another woman, Amanda Smith, with whom he had started a relationship in August 2015—Brian advised Katie of his desire to dissolve their marriage so he could pursue this relationship further.[3] Around the time Brian filed his petition, he and Amanda stayed the night in a camper located at the parties' marital home when Katie and the children were staying elsewhere. In the middle of the night, Katie went to the camper and confronted them. Brian and

---

[3] We note from the outset that Iowa is a no-fault-divorce state. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). "[W]e only consider a party's indiscretions if [a] child was harmed by the behavior." *In re Marriage of Rothfus*, No. 13-1745, 2014 WL 2885340, at *4 (Iowa Ct. App. June 25, 2014).

Amanda accused Katie of assault, which she denies.  Brian and Amanda called the police, but no criminal charges were ever filed against Katie.[4]

Brian moved into his own apartment shortly after this occurrence and subsequently moved in with Amanda in late January 2016.  Amanda has two daughters, one is three-years old and the other is five-years old.  According to Brian, his children and Amanda get along "excellent[ly]" and "her bond with [his] children is very impressive."  Correspondence between Brian and his daughter's guidance counselor indicates that the daughter has transitioned well into Brian and Amanda's home and that she likes Amanda, despite Katie's distaste for her.  Since moving in with Amanda, Brian has sent Katie weekly updates concerning the children.  At some point during the proceedings, Katie started sending Brian weekly updates as well.  If Brian receives physical care of the children, he intends to remove his daughter from the Adel school district, where she has attended kindergarten and first grade and receives counseling regarding her parents' separation, and enroll her in the Waukee school district, where Amanda's children now attend.  He believes Waukee is a superior school district and "[i]t would be more convenient for [him]" if the children went there.  Katie's desire is to allow her daughter to continue her education in Adel.

The parties have struggled in their efforts to co-parent their children since their separation.  Brian has pushed the parties' status as joint-legal custodians to its limits and demanded that he be involved in every single decision relating to the children, even those relating to matters that he clearly had no interest in

---

[4] Brian and Amanda alleged Katie assaulted Amanda on another occasion at their home in February 2016 when Katie was picking up the children.  Again, however, no charges were ever filed.

being involved prior to the separation. The record reveals a volitional effort on the part of Brian to push Katie to the edge throughout the proceedings in an attempt to get her to unravel and violate the temporary-matters order. Katie, obviously struggling with the fact that Brian left her for another woman, said some particularly hateful things to Brian and was slow to accept his rejection of her and his preference for another woman. She was initially resistant to the ideas of co-parenting with Brian and the children having two separate homes. The record reveals, however, that she has made progress in coming to terms with what the situation and the best interest of her children require of her.

The record makes clear that Katie has advised the parties' daughter of the reasoning for the dissolution proceedings and that it is Brian's fault.[5] Katie has stated in electronic correspondence with Brian that Brian has "decided to not be a part of his family" and she "feel[s] it's important to focus on [the children's] actual family and not just [Brian and Amanda]." Katie has also advised Brian that the children would "be better off without [him]" and she wishes he would die. She has also stated, "I don't want my children growing up with you. I will keep them safe."[6] She has told her children that Brian's house is not their home. However, Katie has never denied Brian the visitation he is entitled to under the temporary-matters order. Brian has also directed a fair share of disparaging comments at

---

[5] At trial, Katie testified she never made any disparaging comments to her children about Brian. The statements she made in her exchanges with Brian during the proceedings reveal at least that she told her daughter that the divorce is Brian's fault.

[6] These statements are a small sampling of many similar statements Katie made to Brian during the proceedings. The bulk of these statements, however, were made early in the proceedings, at a time when Katie was still struggling with the fact that Brian left her for another woman. As noted, the record reveals Katie has made progress with understanding her responsibilities as a co-parent.

Katie, at least once in the children's presence, calling her dumb and stupid, a "fat ass," and another name that need not be identified in this opinion.

Both parties are involved with the older child's extracurricular activities and schooling and often communicate with her teacher and guidance counselor. Since the separation, Katie has continued to involve Brian with matters concerning the children's medical and dental appointments, at least to the same extent that he was involved prior to the separation. Katie has unilaterally made decisions regarding their daughter's extracurricular activities and their son's daycare provider but, again, Katie was primarily responsible for coordinating these matters prior to the separation. All of the extracurricular activities that the daughter is involved in pre-date the parties' separation; Brian is familiar with the activities, scheduling, and the contact information of the establishments associated with the activities. Brian has made unilateral decisions regarding the children's religious education and has started taking the children to a Lutheran church without soliciting Katie's input on the matter; the children were baptized as Catholic.

Trial was held in April 2016. The district court entered its decree in August 2016 and, noting its consideration of the factors contained in Iowa Code section 598.41(3) (2015), concluded, "It is in the best interests of the minor children that they be placed in the joint legal custody of Brian and Katie, with primary physical care being placed with Katie." The court awarded Brian "reasonable and liberal parenting time with the minor children as the parties can agree" or, if the parties were unable to agree, every other weekend from "Friday at 5:00 PM until Sunday at 5:00 PM" and every "Wednesday at 5:00 PM until Thursday at the

commencement of the school day or 9:00 AM in the event that the children do not have school." Brian's parenting time was also to include two weeks in the summer and alternating spring breaks, holidays, and other occasions. Brian was ordered to pay monthly child support in the amount of $1239.41 while both children were eligible therefore, and $862.05 upon the ineligibility of one of the children.

Brian filed a timely motion to amend pursuant to Iowa Rule of Civil Procedure 1.904(2) requesting the court to, among other things, "amend his visitation schedule to an amount of time, at a minimum, equal to the parenting time he was granted under the Temporary Stipulation" and recalculate his child-support obligation accordingly. Following a hearing, the court denied Brian's motion and this appeal followed.

## II.     Standard of Review

Review of dissolution cases is de novo. Iowa R. App. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012). Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

## III.    Physical Care

Brian argues the district court erred in granting Katie physical care of the minor children. He specifically argues (1) he has a superior ability to promote the relationship between the children and Katie and (2) he can provide a superior and more stable living arrangement for the children.

"Physical care" involves "the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]." Iowa Code

§ 598.1(7). The court considers a number of factors in determining which parent should have physical care. *See id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). The fundamental goal in determining physical care of a child in an action for dissolution of marriage is to place the child in the care of the parent who will likely accommodate the long-range best interests of the child. *Winter*, 223 N.W.2d at 167. "[T]he basic framework for determining the best interest of the child" is well established. *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007); *see generally* Iowa Code § 598.41. Generally, stability and continuity of caregiving are important considerations. *Hansen*, 733 N.W.2d at 696. Finally, "[t]he objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

Brian first argues his ability to promote the relationship between the children and Katie is superior to Katie's ability to support his relationship with the children. One factor in our analysis is "[w]hether each parent can support the other parent's relationship with the child[ren]." Iowa Code § 598.41(3)(e); *see also id.* § 598.41(5)(b) ("[T]he parent responsible for providing physical care shall support the other parent's relationship with the child."); *In re Marriage of Barry*, 588 N.W.2d 711, 713 (Iowa Ct. App. 1998) ("The denial by one parent of a child's opportunity to have meaningful contact with the other parent is a significant factor in determining the custody or physical care arrangement.").

Brian complains of Katie's statements throughout the proceedings that she does not want the children to have a relationship with him. We recognize early in the proceedings, Katie struggled with the fact that Brian left her for another

woman and Katie directed hostile statements toward Brian. But, this conduct did not permeate the proceedings—Katie came to terms with her situation and progressed toward conduct that is expected of a co-parent and effectively dealt with the emotions that resulted in these early, negative statements. *Cf. In re Marriage of Shanklin*, 484 N.W.2d 618, 619–20 (Iowa Ct. App. 1992) (affirming award of physical care to father where mother was "unable to *effectively deal* with her anger towards" the father (emphasis added)). There is no evidence in the record to support a conclusion that Katie's statements materially affected either the children or Brian's relationship with the children. *See Rothfus*, 2014 WL 2885340, at *4 ("[W]e only consider a party's indiscretions if [a] child was harmed by the behavior."). It is also clear that Katie did not prevent the visitation Brian was entitled to under the district court's temporary-matters order. At the time of trial, Katie was willing and able to support Brian's relationship with his children.

Brian next complains of Katie's inability to co-parent with him as demonstrated by her unilateral decisions relating to medical and dental care, extracurricular activities, the younger child's day care, and other matters. As noted above, although Katie did make some unilateral decisions regarding these matters, her individual handling thereof after the separation was mere maintenance of the status quo, as she handled such matters prior to the parties' separation. Katie, although reluctantly, generally began to include Brian in decisions and provide him with information when she learned that he was interested in being involved in such matters, which he made known by threats, and actual filing, of contempt actions against Katie. We also note that Katie was

not the only party to engage in unilateral decisions, as Brian did the same with regard to the children's religious education.

Brian also argues that "as an historically equal physical care provider of the parties' minor children, [he] can provide the superior and more stable living arrangement for the minor children over the long term." We do consider "[w]hether both parents have actively cared for the child[ren] before and since the separation." Iowa Code § 598.41(3)(d); *see also In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996) ("Although certainly not controlling, due consideration should be given to the fact [one party] has been the historical primary care giver during the marriage."). First and foremost, Brian's status as an alleged "*equal* physical care provider" does not entitle him to physical care. Nor do we find that the care the parties provided to the children was equal. As noted, we find that Katie was the primary caregiver of the parties' children both before and after the parties separated. Although Katie's status as the primary caregiver does not automatically entitle her to physical care in this dissolution proceeding, "[t]he role of primary caretaker is . . . critical in the development of children, and careful consideration is given in custody disputes to allowing children to remain with the parent who has been the primary caregiver." *In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995).

Brian finally argues his "home is more stable, permanent, and wholesome than Katie's," and he is therefore entitled to physical care of the children. We recognize that it is in the children's best interests to be placed in stable and wholesome environments, *see In re Marriage of Carrico*, 284 N.W.2d 251, 254 (Iowa 1979), but Brian's argument on this point is largely materialistic. He

compares his "big, beautiful home" to Katie's home which is akin to "a very small apartment." We are less concerned with the material aspects of the parties' environments and more concerned with the stability and continuity that will be provided in those environments. Although Katie's residence may be temporary and not as lavish as Brian's, there is nothing in the record to support Brian's argument that the environment Katie will provide for the children is less "stable" or "wholesome" than the environment he can provide in his "big, beautiful home."

We find that allowing the children to remain with Katie, who has been their primary caregiver, enables the children to have stability and continuity in their lives and is therefore in their best interests. *See Hansen*, 733 N.W.2d at 696–97; *In re Marriage of Knight*, 507 N.W.2d 728, 730 (Iowa Ct. App. 1993). Although, we think it is a close call as to which parent is better able to support the children's relationship with the other parent, upon our review of all the evidence, we defer to the district court's decision after its opportunity to hear and observe the parties at trial. We therefore affirm the district court's decision to place physical care with Katie.

## IV. Visitation

Brian alternatively argues he "should be awarded significantly more visitation with the children" because "[l]iberal visitation rights are in the children's best interest." He requests that his parenting time be returned to what it was

under the temporary-matters order and that his child support be recalculated accordingly.[7]

"Liberal visitation rights are in the best interests of the children" and children "should be assured the opportunity for the maximum continuing physical and emotional contact with *both* parents." *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993); *accord* Iowa Code § 598.41(1)(a). "Although liberal visitation is the benchmark, our governing consideration in defining visitation rights is the best interests of the children, not those of the parent seeking visitation." *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994).

Brian contends he is entitled to more visitation because Katie refuses to involve him in decision making and does not support his relationship with the children. We have already addressed these issues and do not find that Brian's concerns warrant an increase in his parenting time. Based on the circumstances of this case, we conclude the district court's visitation schedule providing Brian with parenting time every Wednesday and on alternating weekends was not unreasonable. *Cf. In re Marriage of Dorman*, No. 07-0511, 2007 WL 3085907, at *3 (Iowa Ct. App. Oct. 24, 2007) (ordering a similar visitation schedule for a non-custodial parent); *In re Marriage of Lacaeyse*, 461 N.W.2d 475, 477 (Iowa Ct. App. 1990) (same); *In re Marriage of Muell*, 408 N.W.2d 774, 777 (Iowa Ct App. 1987) (same). Additionally, under the decree, the parties are free to agree to

---

[7] Under the temporary-matters order, Brian had six nights of parenting time per two-week period. Under the decree, Brian has four nights of parenting time per two-week period.

additional visitation beyond the minimum amount. We affirm the visitation schedule decreed by the district court.

## V. Appellate Attorney Fees

Both parties request an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* In consideration of these factors, we decline to award appellate attorney fees to Brian, and we award appellate attorney fees to Katie in the amount of $5000. Costs on appeal are assessed to Brian.

## VI. Conclusion

We affirm the physical care and visitation provisions of the decree dissolving Brian and Katie's marriage. We award Katie appellate attorney fees in the amount of $5000 and assess the costs of this appeal to Brian.

**AFFIRMED.**